UNITED STATES of America, Appellee,

v.

Gerald E. LEWIS, Appellant.

UNITED STATES of America, Appellant,

v.

Gerald E. LEWIS, Appellee.

Nos. 92–1367, 92–2117 and 92–1521.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1992.

Decided March 12, 1993.

Mark C. Meyer, Cedar Rapids, IA, argued, for appellant.

Kandice A. Wilcox, Asst. U.S. Atty., Cedar Rapids, IA, argued, for appellee.

Before FAGG and BOWMAN, Circuit Judges, and LARSON,[*] Senior District Judge.

BOWMAN, Circuit Judge.

Gerald E. Lewis appeals from his conviction for conspiring to distribute cocaine in violation of 21 U.S.C. § 846 (1988), and from the 292–month sentence imposed on him by the District Court.[1] Lewis also appeals from the order entered by the District Court ordering the forfeiture under 21 U.S.C. § 853 (1988) of a 1990 Chevrolet S–10 Blazer and of a Panasonic cellular telephone that belonged to him, and from the District Court's refusal to order the government to return his Royal Coachman travel trailer to him in the same condition it was in when seized. The United States cross-appeals from the District Court's decision not to include certain conduct as relevant conduct in calculating Lewis's offense level. For the reasons set forth below, we affirm the judgment of the District Court.

I.

In February 1990, Royce Moore, who was cooperating with law enforcement personnel in their investigation of narcotics activity, informed Greg Brugman, a special agent with the Division of Narcotics En-

---

[*] The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

[1.] The Honorable David R. Hansen, United States District Judge for the Northern District of Iowa. On November 18, 1991, David R. Hansen became a United States Circuit Judge for the Eighth Circuit Court of Appeals.

forcement, that he believed that he could purchase a large quantity of cocaine from Lewis. At Brugman's behest, Moore spoke with Lewis several times regarding such a transaction, and in May 1990 introduced Brugman, who was acting in an undercover capacity, to Lewis. Brugman played the role of the money man for the purchase of the cocaine.

Between May and August 1990, Moore and Brugman had numerous meetings and phone calls with Lewis. Many of these conversations were recorded. In the course of the discussions, Lewis indicated that his source for cocaine was a friend, Carlos, in Florida. Lewis telephoned Carlos at least once in the presence of Moore and Brugman, obtaining a price quote of $24,000 per kilogram of cocaine. Lewis subsequently reported that Carlos was having trouble coming up with five kilograms of cocaine, and, once this problem was resolved, reported that the price was going to be $26,000 per kilogram. It was arranged that Lewis, Moore, and Brugman would fly to Florida, where Lewis would introduce Brugman to Carlos, and where Brugman would purchase five kilograms of cocaine from Carlos. Lewis was to be paid $10,000 by Brugman for Lewis's role in arranging the transaction. On the morning of August 25, 1990, Lewis, Moore, and Brugman met at the airport in Cedar Rapids to fly to Florida. There Lewis was arrested.

Lewis subsequently was charged under a two-count indictment. One count of the indictment charged Lewis with conspiring between 1981 and 1990 to distribute cocaine in violation of 21 U.S.C. § 846 (1988). The other count charged that Lewis used or intended to use his Chevrolet S-10 Blazer, his Royal Coachman travel trailer, and his Panasonic cellular telephone to facilitate the commission of the offense, and sought the forfeiture of these items under 21 U.S.C. § 853 (1988).

At trial, Lewis, a licensed pilot, admitted that in 1982 he had flown a planeload of marijuana into the country from Jamaica. Lewis testified that he had been hired to do this by a man named Fernando Martinez, that he was to have been paid in cash, that

he had received a pound of cocaine as security for the payment due him, and that when payment was not forthcoming he had sold the cocaine. Lewis also admitted that in 1984 he had delivered a pound of cocaine from Carlos to a purchaser in Texas. Lewis testified that he had received only gas money for the trip and that his principal motivation behind the trip was to visit Iowa.

The government introduced evidence that Lewis's involvement with drugs prior to 1990 was much greater than Lewis admitted. Recordings of Lewis's discussions with Brugman and Moore included statements by Lewis that he had carried money in bulk on airplanes numerous times; Brugman testified that Lewis had told him that Lewis had driven three kilograms of cocaine from Florida to Iowa in a pickup truck; two individuals cooperating with the government testified that in the early 1980's Lewis had told them that he had flown cocaine into the country; and a third individual cooperating with the government testified that Lewis had sold him a couple of ounces of cocaine in 1985.

The main thrust of Lewis's defense at trial was that he had withdrawn from any conspiracy after 1984, and that prosecution for the drug activities he admitted to having undertaken in the early 1980's was barred by the statute of limitations. Lewis testified that his purpose in dealing with Brugman and Moore was not to arrange a cocaine transaction, but rather to lure them to Florida where he would have turned them in to the Drug Enforcement Agency (DEA) for a sizeable reward. Lewis claimed that any statements that he had made to Moore and Brugman that were inconsistent with the amount of prior narcotics activity he admitted at trial were "puffing" designed to make Moore and Brugman think that he was an experienced drug dealer. Lewis testified that his job was merely to get Moore and Brugman to Florida, and that Carlos was in charge of contacting authorities.

Government agents, however, testified to a number of inconsistencies in statements Lewis had made at the time of his arrest

regarding his supposed plan to turn Moore and Brugman in to the DEA. Sergeant Beckman testified that when Lewis was taken into custody, Lewis stated that he had been planning to turn Moore and Brugman in to a DEA agent whom Lewis knew in Florida. Sergeant Beckman and Agent Lamere testified that, after Lewis had been taken to the Federal Building, Lewis volunteered that what he and Carlos were really planning to do was to rob Brugman of the money Brugman was taking to Florida. Lewis denied making such inconsistent statements.

The jury found Lewis guilty of conspiring to distribute cocaine and found that the S–10 Blazer and the cellular telephone should be forfeited, but found that the government had not met its burden of proof with regard to forfeiture of Lewis's trailer. The District Court entered judgment upon the jury's verdict, sentencing Lewis to a term of imprisonment of 292 months and ordering the forfeiture of Lewis's S–10 Blazer and of his cellular telephone.

## II.

■■■ Lewis first argues that the trial court erred in excluding testimony from Lori Shaner, who was dating Lewis, that Lewis had told her in advance of August 25, 1990 that his purpose in traveling to Florida was to turn Moore and Brugman in to the DEA. Lewis argues that Shaner's testimony should have been admitted under Federal Rule of Evidence 801(d)(1)(B), which provides that a prior statement by a declarant who testifies at trial may be admitted if the statement is "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication."

The government counters that, since Lewis had already testified regarding his prior statement to Shaner, the testimony was properly excluded under *United States v. Dennis*, 625 F.2d 782, 797–98 (8th Cir. 1980). In that case, the defendant introduced prior consistent statements made by a witness during his grand jury testimony that supported the witness's trial testimo-

ny. The government then impeached the witness using prior inconsistent statements. The defendant sought to reintroduce the same prior consistent statements that he already had introduced in order to rehabilitate the witness. We affirmed the trial court's exclusion of this evidence.

We agree with Lewis that Shaner's testimony should have been admitted as a prior consistent statement under Rule 801(d)(1)(B). *Dennis* is inapposite because in that case the prior consistent statements, which already had been read into evidence, were made before the grand jury as part of a recorded legal proceeding. Thus, there was no issue as to whether or not the statements had actually been made. Rereading the statements from the same grand jury transcripts, and obtaining once more the witness's acknowledgement that he had made the statements would have been "mere repetition," *id.* at 797, with "no probative value," *id.* at 798.

The case before us is much more like *United States v. Parry*, 649 F.2d 292, 295–96 (5th Cir.1981). There, a defendant claimed that, at the time he conducted drug transactions, he believed that he was working for DEA agents. The defendant testified at trial that he had made a contemporaneous statement to his mother to this effect, and also sought to introduce his mother's testimony that he had made the prior consistent statement. The trial court excluded the mother's testimony. The Fifth Circuit reversed Parry's conviction based on the exclusion of the mother's testimony. *Id.* at 296 (stating that rather than being "merely cumulative, the excluded testimony was the only available evidence that could corroborate Parry's story that he had known of the agents' identities"); *see also United States v. Gonzalez*, 700 F.2d 196, 202 (5th Cir.1983) (suggesting that it is more prejudicial to exclude a witness's testimony that defendant made a prior consistent statement if the defendant already has testified that he made such a statement, since the jury is left to wonder why the witness will not corroborate the defendant's testimony).

Shaner's testimony that Lewis had made the statement to her would have tended to corroborate Lewis's testimony that he had made the statement and would have lent some measure of support to Lewis's defense. It should have been admitted into evidence. Nevertheless, although Shaner's testimony should have been admitted, we believe that the exclusion of the testimony was harmless error.

The evidence against Lewis was overwhelming and his defense incredible. Lewis offered no evidence, other than his own testimony and that of Shaner, that what he intended to do in Florida was to turn Moore and Brugman in to the DEA. Yet there was evidence that Lewis had made starkly inconsistent statements in the hours after his arrest regarding a purported plan to rob Moore and Brugman, and regarding the supposed plan to turn Moore and Brugman in and how it was to be accomplished. These inconsistencies support the government's argument that Lewis was scrambling for an innocent explanation of his actions. Moreover, Lewis testified that he had kept his prior cocaine dealings secret from his family, and, in a recorded conversation with Brugman, Lewis stated that he was committed to travelling to Florida on August 25, 1990 since he already had lied to all his "folks and [his] job," III Transcript at 94, telling them that he was going to a wedding on that date. This evidence of prior deceit undermines any claim that a jury would have accorded much weight to anything Lewis may have said to Shaner.

Also, unlike the situation in *Parry*, Lewis's defense was not that he had a good faith belief that he was working for law enforcement agents. Instead, Lewis claimed that he and Carlos were planning to turn Moore and Brugman in to the DEA. Thus, rather than being dependent on Shaner's testimony as the only evidence that could corroborate his story, *cf. Parry*, 649 F.2d at 296, if Lewis and Carlos actually had innocent intentions, Lewis could have procured Carlos as a witness to corroborate his story and to testify as to the steps that Carlos had taken to prepare to turn Moore and Brugman in to the DEA.

Having reviewed the record, we are convinced that the exclusion of Shaner's testimony was harmless beyond a reasonable doubt. *See United States v. Foster*, 815 F.2d 1200, 1202 (8th Cir.1987).

### III.

Lewis next argues that the District Court erred in refusing to instruct the jury on entrapment. During the course of the trial Lewis never argued that he had been entrapped, nor did Lewis request that the jury be instructed on entrapment. Nevertheless, the jury, during deliberations, sent the judge a note that read, "We have a question as to whether or not entrapment can be considered as an issue in this case." After entertaining argument from counsel, the judge instructed the jury that it was not to consider the issue of entrapment. We review the trial court's ruling for abuse of discretion. *See United States v. McKee*, 942 F.2d 477, 479 (8th Cir.1991).

The precise issue presented in the case at hand was before the Eleventh Circuit in *United States v. Blanton*, 793 F.2d 1553, 1563–64 (11th Cir.), *cert. denied*, 479 U.S. 1021, 107 S.Ct. 678, 93 L.Ed.2d 728 (1986). There, as here, the defendant neither asserted an entrapment defense nor sought an entrapment instruction. There, as here, the jury, during deliberations, inquired about the defense of entrapment, and there, as here, the trial court refused to provide an instruction on entrapment. The Eleventh Circuit held that Blanton had waived any entrapment defense stating:

> entrapment is an affirmative defense, ordinarily requiring admission that one engaged in the alleged acts. The trial court properly refused to instruct the jury on entrapment after deliberations had begun; holding otherwise would have unfairly prevented the government from responding to that defense. Appellants made a decision to forego this argument. They may not have it both ways once it appears that they made the wrong tactical choice.

*Id.* at 1564 (citations omitted).

Lewis makes much of the fact that *Blanton* was decided before *Mathews v. United*

*States,* 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), in which the Supreme Court held that a defendant is entitled to claim innocence and at the same time to assert an entrapment defense. Lewis argues that the decision in *Blanton* depended on the fact that, at the time that case was decided, defendants were forced to choose between claiming innocence and asserting entrapment. Therefore, Lewis reasons, a defendant who claimed that he was innocent could fairly be held to have waived any claim of entrapment. By contrast, he argues, a defendant does not necessarily waive an entrapment defense today simply because the defendant does not assert it. We disagree.

■ *Mathews* does not free a defendant from the need to consider whether asserting an entrapment defense will undermine an effort to convince the jury that the defendant simply did not do the acts charged. "The defense[s] of entrapment and factual innocence are contradictory defenses, and while they may of course be simultaneously pursued, doing so involves serious risks of impairing or destroying a defendant's credibility." *United States v. Van Kirk,* 935 F.2d 932, 934 (8th Cir.1991) (citations omitted). In other words, defendants still face a tactical decision as to whether to assert an entrapment defense, and failing to do so in a timely manner is still a waiver of the defense. *Mathews* does not license defendants to place entrapment in issue after it is too late for the government to rebut the defense. We hold that Lewis waived the defense of entrap-

ment by failing to raise it before the case was submitted to the jury.[2]

Because Lewis failed to raise the defense of entrapment before the case was submitted to the jury and thus waived the defense, the trial court did not abuse its discretion in refusing to submit the issue of entrapment to the jury.

## IV.

Lewis appeals the trial court's inclusion in the conduct for which he was sentenced of his actions in conspiring to distribute the five kilograms of cocaine that Brugman was to purchase from Carlos and that were at the heart of the government's case. Lewis makes several different arguments to support his contention that these five kilograms of cocaine should not have been included in the quantity of drugs for which he was sentenced. None of these arguments has merit.

Lewis first argues that the District Court abdicated its duty to make an independent finding of fact at sentencing, *see United States v. Brown,* 946 F.2d 58, 60–61 (8th Cir.1991), as to whether Lewis conspired to distribute this cocaine. Lewis bases his argument on the District Court's statement that it was convinced that the jury convicted Lewis of conspiring to distribute drugs in 1990 (rather than of simply failing to withdraw from the conspiracy after 1984). We do not ascribe the weight to this comment that Lewis does. We believe that the trial judge was merely commenting on the jury's verdict, and that he remained fully aware of his duty to determine independently the facts relevant to sentencing. In

2. Though we base our decision squarely on waiver, we also observe that the record provides little factual support for an entrapment defense. An "entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews,* 485 U.S. at 63, 108 S.Ct. at 886. A defendant is entitled to an entrapment instruction when there is "sufficient evidence from which a reasonable jury could find entrapment." *Id.* at 62, 108 S.Ct. at 886. Lewis's claim of entrapment is, of course, relevant only to his 1990 conduct since none of his prior drug activity involved government agents or persons cooperating with the government.

The record strongly suggests, however, that Lewis was predisposed to conspire to distribute cocaine in 1990. Lewis himself admitted at trial that on two prior occasions he had participated in distributing a pound of cocaine. The government's evidence suggested Lewis had had other involvement in distributing cocaine, including, perhaps, having driven three kilograms of cocaine from Florida to Iowa. Lewis's attorney admitted that the reason he did not request an entrapment instruction was that he thought he would not receive it. Even if Lewis had asserted an entrapment defense in a timely manner, it seems unlikely that he would have been entitled to have the issue submitted to the jury.

fact, at trial, the judge refused to submit to the jury a special interrogatory Lewis had requested to aid in sentencing, stating that "the responsibility [is] on the Court and not the jury to determine what is relevant conduct for sentencing purposes." I Transcript at 185.

■ Lewis next argues that trial court erred in making several different findings of fact regarding the five kilograms of cocaine. We review these findings for clear error. *United States v. Beal*, 940 F.2d 1159, 1163 (8th Cir.1991). First, Lewis contends that the court erred in finding that Lewis conspired with Carlos to distribute this cocaine. He argues that, at most, the evidence showed that he was going to introduce Brugman to Carlos and that thereafter Brugman and Carlos would negotiate any cocaine transaction. However, the court's finding is supported by the evidence showing that Lewis served as a go-between for Brugman and Carlos during extensive negotiations in which both the price and the quantity of cocaine to be purchased were established, that Lewis was actively involved in coordinating the transaction, and that Lewis was to be paid $10,000 by Brugman for his services. The trial court's finding therefore is not clearly erroneous.

■ Second, Lewis argues that the trial court erred in finding that he was reasonably capable of producing five kilograms of cocaine. *See* United States Sentencing Commission, *Guidelines Manual*, § 2D1.4, comment. (n. 1) (Nov. 1991) (court should exclude any quantity of drugs that the defendant was not reasonably capable of producing). We disagree. The court's finding is supported by the fact that Lewis admitted that he had transported a pound of cocaine supplied by Carlos from Florida to Texas, and by evidence that Lewis may have transported three kilograms of cocaine, presumably supplied by Carlos, from Florida to Iowa. In addition, the government introduced evidence of prolonged negotiations between Lewis and Carlos regarding Brugman's purchase of the five kilograms of cocaine, negotiations that even bogged down at one point when Car-

los apparently indicated that he was unable to obtain that large a quantity of cocaine, but that continued after Lewis indicated that the problem was resolved. On this record, the trial court's finding is not clearly erroneous.

■ Third, Lewis argues that he was predisposed to distribute only smaller quantities of cocaine, and that the court erred in finding that it was not sentencing entrapment for the government to negotiate to purchase five kilograms of cocaine from him. *See United States v. Lenfesty*, 923 F.2d 1293, 1300 (8th Cir.) (discussing sentencing entrapment), *cert. denied,* —— U.S. ——, 111 S.Ct. 1602, 113 L.Ed.2d 665 (1991). The challenged finding, however, is supported by the fact that Lewis admitted he had twice distributed pound quantities of cocaine and by evidence that Lewis may have transported three kilograms of cocaine from Florida to Iowa. Although Lewis makes much of the fact that these quantities are smaller than the five kilograms Brugman sought to purchase, the trial court's finding that Lewis was predisposed to conspire to distribute five kilograms of cocaine is not clearly erroneous. *See Lenfesty*, 923 F.2d at 1300 (holding that defense of sentencing entrapment fails where defendant is predisposed to help government agent purchase cocaine in "whatever quantities he desire[s]").

In light of the evidence developed at trial and at the sentencing hearing, none of the findings of fact that Lewis assails is clearly erroneous. Therefore the District Court correctly attributed the five kilograms of cocaine to Lewis for sentencing purposes.

## V.

■ The government cross-appeals the District Court's decision not to include Lewis's actions in flying marijuana into the country in 1982 as relevant conduct for purposes ·of sentencing. The sentencing guidelines provide that relevant conduct includes all acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." United States Sentencing Commission, *Guidelines*

*Manual,* § 1B1.3(a)(2) (Nov. 1991). The trial court's determination of what conduct is relevant conduct for sentencing purposes is a determination of fact that we will reverse only if it is clearly erroneous. *United States v. Phillippi,* 911 F.2d 149, 151 (8th Cir.1990), *cert. denied,* 498 U.S. 1036, 111 S.Ct. 702, 112 L.Ed.2d 691 (1991).

It is undisputed that there existed some relationship between Lewis's actions in flying marijuana into the country and the conspiracy to distribute cocaine of which he was convicted. Lewis admitted at trial that he had received a pound of cocaine as security for the payment due to him for flying the planeload of marijuana into the country, that when the payment was not forthcoming he had sold the cocaine, and that this was his first involvement with distributing cocaine.

Compared with the charged offense, however, the asserted relevant conduct involved a different drug (marijuana rather than cocaine); different conduct on Lewis's part (flying drugs into the country as a hired pilot, rather than actively distributing them); and different people (Martinez, who hired Lewis to fly the plane, was not shown to have any connection to cocaine distribution beyond the fact that he provided Lewis with a pound of cocaine as security for the payment due to Lewis, and none of the other persons involved in Lewis's cocaine distribution ring was involved in the marijuana flight).

On this record, the trial court did not clearly err in holding that the marijuana flight was not relevant conduct for sentencing purposes.

## VI.

■ Finally, Lewis challenges the forfeiture of his S–10 Blazer and of his cellular telephone, both of which were forfeited under 21 U.S.C. § 853(a)(2) (1988). That section provides that any person convicted of a violation of certain drug laws (including those under which Lewis was convicted) shall forfeit "any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation." Lewis argues there was not a sufficient nexus between the items of property forfeited and the criminal activity with which he was charged to justify the forfeitures.

In *United States v. Premises Known as 3639–2nd Street, N.E., Minneapolis, Minnesota,* 869 F.2d 1093, 1096 (8th Cir. 1989), we held that in order to support a forfeiture under 21 U.S.C. § 881(a)(7) (1988), which contains substantially similar language to § 853(a)(2), there must be "something more than an incidental or fortuitous contact between the property and the underlying illegal activity, although the property need not be indispensable to the commission of" the offense. In that case, we affirmed the forfeiture of a house used for drug storage and concealment and in which a drug transaction took place. We found that because the crime, unlawful distribution of cocaine, "occurred in the house," the "relationship [was] obvious." *Id.* at 1097; *cf. United States v. One 1976 Ford F–150 Pick–Up VIN F14YUB03797,* 769 F.2d 525 (8th Cir.1985) (reversing forfeiture of pickup truck where there was only an insubstantial connection between the vehicle and the illegal activity, and where it was unclear that the vehicle facilitated the possession of marijuana in any way other than by once helping the defendant inspect his marijuana crop).

The record in this case supports the finding that there was "more than an incidental or fortuitous contact" between the property and Lewis's criminal activity. The evidence showed that Lewis drove the S–10 Blazer to and from meetings with Moore and Brugman, and that on more than one occasion Lewis, Moore and Brugman met in the S–10 Blazer. During one meeting, while all three men were in the vehicle, Lewis telephoned Carlos on the cellular phone and obtained a price estimate for the five kilograms of cocaine. This conversation with Carlos was an overt act in furtherance of the precise criminal conduct of which Lewis was convicted, namely, conspiring, with Carlos and others, to distribute cocaine. On this evidence, there was a sufficient nexus between the property for-

 

feited and the illegal activity to justify the forfeiture.

■ Lewis also appeals the District Court's refusal to order that the government return his trailer to him in the same condition as it was in when seized. Lewis notes that the Department of Justice has a special asset forfeiture fund to defray expenses associated with maintaining property subject to forfeiture proceedings, *see* 28 U.S.C. § 524(c)(1)(A) (1988), and argues that the District Court should have exercised its supervisory powers to order the government to use the fund to effect any necessary repairs to the trailer or to compensate Lewis for any diminution in the trailer's value.

Lewis, however, has not cited any authority that holds that a court may so order the government, nor has he produced any evidence that his trailer was damaged in any way while in the government's custody. Moreover, we draw support for the idea that Lewis is not entitled to be compensated for any damages he might have suffered from the fact that the Federal Tort Claims Act does not allow suits against the government arising out of the detention of goods by any law-enforcement officer. 28 U.S.C. § 2680(c) (1988); *see also Kosak v. United States*, 465 U.S. 848, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984) (affirming summary judgment against plaintiff in suit seeking damages for injury to property seized by customs agents but subsequently returned to plaintiff upon his petition for relief from civil forfeiture); *Cheney v. United States*, 972 F.2d 247 (8th Cir.1992) (affirming summary judgment against plaintiff in suit seeking damages for injury to automobile that arose when federal drug task force agents returned automobile title they had previously seized to the wrong person and that person used the title to obtain the car from a storage facility and damaged the car) (per curiam). We therefore conclude that the District Court did not err in refusing to issue the order sought.

* Robert Reich is substituted for former Secretary of Labor Lynn Martin as appellee in this action

## VII.

We have reviewed carefully the remaining arguments advanced by Lewis and we conclude that they are without merit. The judgment of the District Court is affirmed.